**UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JOHANA MARTINEZ, | **1:16-cv-01556-LJO-SKO** |
| **Plaintiff,** | **MEMORANDUM DECISION AND ORDER RE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, SUMMARY ADJUDICATION** |
| **v.** | |
| UNITED STATES OF AMERICA, | |
| **Defendant.** | **(ECF No. 54)** |

## I. <u>INTRODUCTION</u>

In this medical malpractice action brought under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 2671-2680, Plaintiff Johana Martinez ("Plaintiff" or "Martinez") brought suit against Defendants United States of America ("United States" or "Defendant") and Kaweah Delta Health Care District ("KDHCD"). This action arises out of injuries Plaintiff sustained during a robotic-assisted total laparoscopic hysterectomy with bilateral salpingectomy and cystoscopy performed by Dr. Elizabeth Enderton ("Dr. Enderton"), a physician employed by Family HealthCare Network ("FHCN") at the Kaweah Delta Medical Center.

Defendant United States acknowledged in a certification that Dr. Enderton is deemed an employee of the Public Health Service pursuant to the Federally Supported Health Centers Assistance Act of 1992 ("FSHCAA"), 42 U.S.C. § 233, and was acting in the scope of her employment at the time

1

of the events alleged in the FAC. ECF No. 13-1. Defendant United States further certified that FHCN, a federally funded healthcare facility and a grantee of the United States Department of Health & Human Services, is covered by the FTCA by operation of the FSHCAA, 28 U.S.C. § 2697and 28 C.F.R. § 15.3. *Id.* After the voluntary dismissal of KDHCD, ECF No. 39, the United States is the sole Defendant in this action.

Defendant moved for summary judgment on November 8, 2018 ("Mot."). ECF No. 54-1. Plaintiff opposed ("Opp."), ECF No. 57, and Defendant filed a reply ("Reply"), ECF No. 66-1. The motion is ripe for review, and this matter is suitable for disposition without oral argument. *See* Local Rule 230(g). Having carefully considered the record in this case, the parties' briefing, and the relevant law, the Court DENIES Defendant's motion in its entirety.

## II. BACKGROUND[1]

### A. Factual Background

Plaintiff was born on April 16, 1980. Declaration of Jeffrey J. Lodge ("Lodge Decl."), Ex. 1 (Deposition of Johana Martinez ("Martinez Depo.")) at 177:7-8. Since high school, she had suffered from heavy menstrual cycles, excessive cramping, and debilitating pain. *Id.* at 31:17-18, 32:22-25. Plaintiff's significant other worked for Dr. Enderton as a medical assistant and discussed with Plaintiff that Dr. Enderton performed hysterectomies by "non-invasive robotic" surgery that had a lower recovery period than traditional surgery. *Id.* at 31:15-32:12, 37:17-38:11. Plaintiff initially consulted with Dr. Enderton in October of 2014. *Id.* at 36:5-11.

On December 15, 2015, Dr. Enderton performed a robot-assisted total laparoscopic hysterectomy with bilateral salpingectomy and cystoscopy. Lodge Decl., Ex. 6 (Deposition of Elizabeth Enderton ("Enderton Depo.")) at 40:5-10. Dr. Enderton performed the surgery using the Intuitive Surgical

---

[1] Both parties lodged objections to certain evidence put forward by the other. Objections to relevant evidence are addressed in the Discussion section.

Endoscopic Instrument Control System with Surgical Endoscopic Instruments, known as the Da Vinci Surgical System. ECF No. 59, Declaration of Michael T. Margolis ("Margolis Decl.") ¶ 6(c)(1).

Dr. Enderton did not recall any complications during the surgery. Enderton Depo. at 63:21-25. Plaintiff testified that upon awaking after the surgery, she had pain in her pelvic area. Martinez Depo. at 71:9-16. She testified that Dr. Enderton told her that because of the size and number of uterine fibroids, the surgery involved the removal of more tissue than anticipated. *Id*. at 74:3-10. In the days following the surgery, Plaintiff experienced pain, difficulty eating and using the restroom, difficulty walking, and vomiting. *Id*. at 72:3-10. At approximately 1:00 p.m. on December 16, 2014, the day after surgery, Plaintiff had a fever of 102.8 degrees. Enderton Depo. at 68:9-21. She had increased pain compared to the day before, had difficulty lying down straight, and had trouble keeping food down. Martinez Depo. at 75:25-76:7. Her white blood cell count was elevated.[2] Dr. Enderton's notes state that later in the day on December 16, Plaintiff's temperature had stabilized below 100.4 degrees and that she was "doing well, ambulating, voiding," and had pain control with pain medications. *Id*. at 65:11-66:15.

Dr. Enderton's notes for December 17, 2014, state that Plaintiff reported difficulty taking a deep breath and that she was ambulating "[s]ome, but not much." Enderton Depo. at 67:22-68:8. Her temperature remained stable. *Id*. at 68:15-17. Dr. Enderton attributed Plaintiff's prior fever to atelectasis, or collapsed lung. *Id*. at 74:20-75:1. Dr. Enderton was also concerned about a possible infection, abscess, or hematoma, which might have explained the fever and elevated white blood count, and ordered a urinalysis test. *Id*. at 75:18-76: 1. Plaintiff was discharged that day, and Dr. Enderton did not think that Plaintiff had an abscess or infection, based on "improvement in her vital signs and in her laboratory studies," as well as a physical exam. *Id*. at 78:2-79:18. The discharge instructions listed eleven conditions under which she should alert her physician. They included redness or swelling or

---

[2] Prior to the surgery, Plaintiff's white blood cell count was 7.63 thousand cells per microliter of blood, within the reference range of 4.0 to 11.0. Enderton Depo. at 65:1. At approximately 5:49 p.m. on December 15, 2014, the count was 16.04. At 4:12 p.m. on December 16, 2014, the count was 14.84. Enderton Depo. at 69:23-70:22, 71:8-17. No count was taken on December 17, 2014. *Id*. at 71:18-23.

drainage at the incision sites, a fever of 101 degrees or more, and persistent pain, among others. *Id*. at 80:18-81:25.

On December 23, 2014, Plaintiff went to the emergency room at Kaweah Delta after experiencing a fever and a spike in pain in her upper abdominal area. Martinez Depo. at 87:2-7. Dr. Enderton, who was scheduled to go on vacation the next day, was not at the hospital. Enderton Depo. at 83:1-21. A CT scan performed while Plaintiff was hospitalized determined that Plaintiff had an abdominal abscess that was likely due to bowel perforation. *Id*. at 107:23-108:8. Plaintiff was treated and discharged on January 9, 2015. *Id*. at 125:5-127:11. A few days after the discharge, she requested a second opinion, and Dr. Enderton referred her to a surgeon at UCSF. *Id*. at 146:4-148:6. That was Dr. Enderton's last professional interaction with Plaintiff.[3]

On January 15, 2015, Plaintiff returned to the emergency room, complaining of abdominal pain and fever. *Id*. at 137:23-138:6. Doctors noted an abscess under the spleen, admitted her to place drains to remove the fluid collection, and discharged her on January 26, 2015. *Id*. at 135:3-137:9. Plaintiff had the second consultation at UCSF, where she was admitted for an incision and drainage procedure for an abdominal wall abscess on February 12, 2015. *Id*. at 146:4-147:14.

During a follow-up visit to UCSF, Dr. Jonathan T. Carter stated in a medical record dated August 15, 2018, that following Plaintiff's robotic hysterectomy, she had "a likely bowel injury resulting in sepsis, enterocutaneous fistula, and abdominal wall abscess. At that time she was transferred to UCSF and underwent [incision and drainage] of her abdominal wall. Since then she has recovered from this episode but noticed a hernia at the I+D site over the last few years . . . ." *Id*. Lodge Decl., Ex. 3. Plaintiff testified that she has ongoing symptoms, including defecating blood, black stool, anal leakage, abdominal pain, difficulty sleeping, flashbacks and nightmares about the procedures, post-

---

[3] They have seen each other socially since then. *Id*. at 148:8-21.

traumatic stress disorder, major depressive disorder, generalized anxiety disorder, an inability to be intimate, an inability to do household chores or climb stairs, panic attacks, and other physical limitations related to the pain. Martinez Depo. at 274:6-275:11.

Plaintiff got her doctorate in psychology in 2017 and currently works as a behavioral health unit supervisor for the correctional mental health team at Kern Behavioral Health and Recovery Services in Bakersfield. *Id.* at 23:20-24:14, 185:21-186:3. Her job responsibilities include overseeing the mental health team in all of Kern County Sheriff's detention facilities. *Id.* at 24:17-20.

**B.** **Procedural Background**

Plaintiff filed this lawsuit on October 13, 2016, alleging that she was injured as a result of Dr. Enderton's robot-assisted total laparoscopic hysterectomy with bilateral salpingectomy. ECF No. 1. The suit named Dr. Enderton, FHCN, the United States Department of Health and Human Services, and KDHCD as defendants. *Id.* After the United States moved to dismiss, ECF No. 14, Plaintiff filed a First Amended Complaint ("FAC"), ECF No. 16. The FAC brought four causes of action: 1) professional negligence; 2) negligence – vicarious liability/respondeat superior; 3) negligent hiring, retention, and supervision; and 4) negligence. *Id.* The United States was named as a defendant in the first three counts, and KDHCD was named as the defendant in the fourth count. *Id.* The second and third counts were dismissed. ECF No. 23. KDHCD was voluntarily dismissed on August 23, 2018. ECF No. 39. Dr. Enderton is the deemed employee of the United States, and thus the United States is the only defendant in the action.

Plaintiff filed a state-court suit against Intuitive Surgical, Inc., which manufactured the robot, and Dr. Abiy Meshesha, the physician who evaluated Plaintiff on December 23, 2014. Lodge Decl. ¶ 2.

The United States denied liability in this action. In an oversight, Plaintiff failed to take Dr. Enderton's deposition prior to the deadline for non-expert discovery. Lodge Decl. ¶ 6.

Plaintiff timely designated Dr. Michael Thomas Margolis as an expert witness on the standard of care on August 1, 2018. Lodge Decl. ¶ 7, Ex. 2 ("Margolis Report"). Dr. Margolis is an assistant

clinical professor in obstetrics and gynecology at the school of medicine at UCLA who is board-certified in obstetrics/gynecology and in female pelvic medicine and reconstructive surgery. ECF No. 58, Declaration of Ari Friedman ("Friedman Decl."), Ex. D; ECF No. 58-1 at PDF p. 111-12. Dr. Margolis's report states that while it was within the standard of care for Plaintiff to undergo surgical treatment for her uterine fibroids but that the treatment she received fell below the standard of care in two ways. Margolis Report ¶ 1. First, "based on the timing and development of symptoms and the nature of the injury incurred by the Plaintiff, the identified bowel perforation occurred during surgery and was not identified by the operative surgeon." Margolis Report ¶ 2(a). Dr. Margolis states that the perforation could have resulted from the da Vinci system or from improper use of the system but does not opine as to which was the cause. Instead, his report states that "[g]enerally accepted standards would have required the operating surgeon to have identified and corrected this issue prior to completion of the surgery. The size, nature and severity of the injury would have been identifiable to the operative surgeon at the time of the surgery." *Id*. Second, Dr. Margolis's report states that on the morning of December 17, 2014, Plaintiff "was identified as having an elevated white blood cell count, elevated temperature and feverish condition. The generally accepted standard of care for persons within the medical community would have required the operative surgeon not to discharge the patient and to continue to monitor the patient's symptoms." Margolis Report ¶ 2(b). It concludes that if the symptoms worsened, "laparoscopic exploratory surgery would have been required to correct the source of the ongoing symptoms . . . ." *Id*. Dr. Margolis's opinions are limited to the care rendered from December 15, 20104, through December 17, 2014, and expresses no opinions concerning medical treatment after December 17, 2014. *Id.* ¶ 7. The report states that given Plaintiff's ongoing symptoms, it is more likely than not that she would need future bowel surgery. *Id*. ¶ 4. It further states that Plaintiff "will require the following future medical treatments to a reasonable degree of medical certainty: chronic pain control, future bowel/abdominal surgery, laboratory and radiologic evaluations and physical therapy." Margolis Report ¶ 6. Defendant did not depose Dr. Margolis. *See* Margolis Decl. ¶ 4.

Plaintiff's expert disclosure also listed Dr. Enderton in her Rule 26(a)(2) disclosure, among other treating physicians. ECF No. 58-1 at PDF p. 79. Defendant objected when Plaintiff set a date for Dr. Enderton's deposition on the ground that as a deemed employee of the United States, she was a percipient witness only, and the deadline for fact discovery had passed. Lodge Decl. ¶ 12. Following a discovery conference, Plaintiff submitted a Supplemental Expert Disclosure for Dr. Elizabeth Enderton. ECF No. 45. The magistrate judge determined that even though the supplemental disclosure provided an inadequate summary of treating physician Dr. Enderton's opinions pursuant to Federal Rule of Civil Procedure 26(a)(2)(C), Plaintiff would be permitted to depose Dr. Enderton because the failure was harmless. ECF No. 46. Dr. Enderton gave her deposition on October 5, 2018. Near the close of the deposition, Defendant's counsel elicited Dr. Enderton's opinion that, based on her training, experience, and treatment of Plaintiff, she did not believe in her expert medical opinion that any of the care she provided to Plaintiff bell below the standard of care. Enderton Depo. at 149:3-11. Under questioning from Plaintiff's counsel, she testified that she had not been retained as an expert witness by any party in the case. *Id*. at 150:11-14.

Defendant timely designated Dr. Ramin Mirhashemi as an expert witness. Dr. Mirhashemi is a gynecologic oncologist and former associate professor of obstetrics and gynecology at Harbor-UCLA Medical Center. Lodge Decl., Ex. 4 ("Mirhashemi Report") at 4. Dr. Mirhashemi's report states that the robotic surgery was within the standard of care and that Plaintiff was "fully counseled about the surgical procedure, including all the potential complications of surgery." *Id*. ¶¶ 1-2. The report further states that based on Dr. Mirhashemi's experience as a physician who performs bowel surgery, the surgery was performed within the standard of care. *Id*. ¶ 3. Dr. Mirhashemi's opinion is that the bowel perforation "could not have occurred during surgery" because if it had, fecal contents would have been visible and Plaintiff would have experienced "signs and symptoms of sepsis within 24 hours" of the surgery. *Id*. That Plaintiff did not return to the emergency room for eight days following surgery is evidence that the perforation was not immediate. *Id*. Dr. Mirhashemi's report further states that the

decision to continue monitoring Plaintiff at the hospital for two days following what is typically an outpatient procedure was diligent, and that because an elevated white blood cell count is "extremely common" following this type of surgery, discharging Plaintiff when she no longer had a fever and had a white blood cell count that was trending downward was appropriate. *Id*. ¶ 4. Finally, the report opines that Plaintiff "has clinically recovered from the bowel issues related to her surgery" and that there is no evidence that she will need further surgeries related to the hysterectomy. *Id*. ¶ 5.

## III. **STANDARD OF DECISION**

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. At summary judgment, a court's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The Court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence. *See id.* at 255; *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). But if the evidence of the nonmoving party is merely colorable or is not significantly probative, summary judgment may be granted. *See id.* at 249-50. A fact is "material" if its proof or disproof is essential to an element of a plaintiff's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A factual dispute is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) (internal citation omitted).

The moving party bears the initial burden of informing the Court of the basis for its motion, and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact for trial. *Celotex*, 477 U.S. at 323. If the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and, by its own affidavits or discovery, set

forth specific facts showing that there is some genuine issue for trial in order to defeat the motion. *See* Fed. R. Civ. P. 56(c); *Liberty Lobby, Inc.*, 477 U.S. at 250. "If a moving party fails to carry its initial burden of production, the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial." *Nissan Fire*, 210 F.3d at 1102-1103; *see Adickes v. S.H. Kress & Co*., 398 U.S. 144 (1970).

## IV. **DISCUSSION**

### A. *Prima Facie* **Case Of Medical Negligence**

Defendant makes two arguments in support of its claim that the Court should grant summary judgment to Defendant because Plaintiff has not made out a *prima facie* case of medical negligence. First, it argues that because Plaintiff's two designated medical experts have contradictory opinions, Plaintiff cannot satisfy her burden of proof on the standard of care. Second, it argues that Plaintiff's retained expert Dr. Margolis should be excluded under *Daubert*, leaving Plaintiff with no expert to opine on the standard of care or medical causation.

Under California law, the elements for professional negligence, such as medical malpractice, are: "(1) the duty of the professional to use such skill, prudence, and diligence as other members of his profession commonly possess and exercise; (2) a breach of that duty; (3) a proximate causal connection between the negligent conduct and the resulting injury; and (4) actual loss or damage resulting from the professional's negligence." *Turpin v. Sortini*, 31 Cal.3d 220, 229-230 (1982).

Physicians specializing in a medical area are "held to that standard of learning and skill normally possessed by such specialists in the same or similar locality under the same or similar circumstances." *Quintal v. Laurel Grove Hospital*, 62 Cal. 2d 154, 159-160 (1964).

The general rule applicable to medical practice cases is:

> The standard of care against which the acts of a physician are to be measured is a matter peculiarly within the knowledge of experts; it presents the basic issue in a malpractice action and can only be proved by their testimony [citations], unless the conduct required by the particular circumstances is within the common knowledge of the layman. The "common knowledge" exception is principally limited to situations in which the plaintiff

can invoke the doctrine of res ipsa loquitur, i.e., when a layperson is able to say as a matter of common knowledge and observation that the consequences of professional treatment were not such as ordinarily would have followed if due care had been exercised. The classic example, of course, is the X-ray revealing a scalpel left in the patient's body following surgery. Otherwise, expert evidence is conclusive and cannot be disregarded.

*Flowers v. Torrance Memorial Hospital Medical Center*, 8 Cal. 4th 992, 1001 (1994).

"What is or what is not proper practice on the part of the physician is uniformly a question for experts and can be established only by the testimony of such experts." *Sansom v. Ross–Loos Medical Group*, 57 Cal. App. 2d 549, 553 (1943). "Plaintiffs thus [need] opinions from qualified experts to establish a prima facie case." *Osborn v. Irwin Memorial Blood Bank*, 5 Cal. App. 4th 234, 273 (1992).

Moreover, "[n]egligence on the part of a physician or surgeon will not be presumed; it must be affirmatively proved." *Huffman v. Lindquist*, 37 Cal. 2d 465, 474 (1951). In a medical malpractice action, "causation must be proven within a reasonable medical probability based upon competent expert testimony. Mere possibility alone is insufficient to establish a prima facie case." *Jones v. Ortho Pharmaceutical Corp.*, 163 Cal. App. 3d 396, 402-403 (1985); *see also Gotschall v. Daley*, 96 Cal. App. 4th 479, 484 (2002) ("[E]xpert testimony was essential to prove causation. Without testimony on causation, plaintiff failed to meet his burden on an essential element of the cause of action."). "In California, causation must be founded upon expert testimony and cannot be inferred from the jury's consideration of the totality of the circumstances unless those circumstances include the requisite expert testimony on causation." *Cottle v. Superior Court*, 3 Cal. App. 4th 1367, 1384 (1992).

### 1. Standard Of Care

Defendant argues that Plaintiff's two experts on the standard of care, Dr. Margolis and Dr. Enderton, offer opinions that materially contradict each other, leaving her unable to establish a breach of the standard of care. In support of its argument that this inconsistency in opinion by a party's disclosed experts, Defendant cites Pennsylvania case law holding that if a party's expert witnesses "so vitally disagree on essential points as to neutralize each other's opinion evidence, their sponsor has not borne the burden of proof which the law casts upon him, and to that extent has failed to make out his

case." *Mudano v. Philadelphia Rapid Transit Co.*, 289 Pa. 51, 61 (1927); *see also Menarde v. Philadelphia Transp. Co.*, 376 Pa. 497, 501 (1954) ("it has been held essential that no absolute contradictions appear in [expert witnesses'] ultimate conclusions, although minor points of difference between such witnesses would not necessarily exclude their testimony"); *Brannan v. Lankenau Hosp.*, 490 Pa. 588, 596 (1980) (noting that while "[i]t is true we have previously held that a plaintiff's case will fail when the testimony of his two expert witnesses is so contradictory that the jury is left with no guidance on the issue," the "conflicts in testimony are fatal only if absolute" and holding that the "minor divergence" at issue in the case before it did not "sufficiently [compromise] the witness' testimony on direct to justify removal of this issue from jury consideration"). Though Defendant cites no California courts adopting this principle or citing this body of law, Defendant contends that the principle is a sound one.

Plaintiff responds that Dr. Enderton was not a retained expert, that she was only listed as a treating physician, and that her opinion testimony on the ultimate issue, which Defendant's counsel elicited at her deposition, is "outside of her purview as a treating physician." Opp. at 11. Defendant responds that Plaintiff's own expert designation for Dr. Enderton included that she was expected to offer testimony concerning the standard of care. *See* Lodge Decl., Ex. 5 (Plaintiff's Supplemental Expert Disclosure for Dr. Elizabeth Enderton) at 2:5-7 ("She will testify about the care and treatment for the aforementioned surgery, including pre-operative, operative, and post-operative care, including the respective standard of care for each.") & 2:21-23 ("She will testify that she did not note any bowel perforation at that time and the standard of care regarding post-surgical inspection of wound sites."). Plaintiff's argument that Dr. Enderton served only as a percipient witness rings hollow, given the parties brought this dispute before the magistrate judge, resulting in an order that Plaintiff "amend her disclosure of treating physician Dr. Elizabeth Enderton, D.O. as an expert witness pursuant to Federal Rule of Civil Procedure 26(a)(2)(A)," in the form of a disclosure that meets the requirements of Federal Rule of Civil Procedure 26(a)(2)(C) by setting forth "(i) the subject matter on which the witness is

expected to present evidence under Federal Rule of Evidence 702, 703, or 705; and (ii) a summary of the facts and opinions to which the witness is expected to testify." ECF No. 45.[4]

This is, to be sure, an unusual situation. Plaintiff has listed as a Rule 26 witness the physician (and former defendant) she alleges committed malpractice, an act that Defendant argues should result in summary judgment against Plaintiff because of a disagreement among Plaintiff's experts about the ultimate issue in the case.

The Court is not persuaded that there is, or should be, a blanket rule requiring a grant of summary judgment against a party whose *retained* experts disagree on an essential point in the case. But even that situation is absent here, where Plaintiff's non-retained expert, a treating physician and former defendant, disagrees with the Plaintiff's retained expert about whether she committed a breach of the standard of care.

## 2. Exclusion Of Dr. Margolis's Opinions

Defendant seeks to exclude Dr. Margolis's testimony, which it contends rests on unsound methodology based on speculative assumptions and erroneous data, for allegedly failing to meet the reliability and fitness requirements of Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and its progeny.

### a. Expert Testimony

_____

[4] Federal Rule of Civil Procedure 26 provides that "if the witness is one retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony," that witness must provide a written expert report. Fed. R. Civ. P. 26(a)(2)(B). Rule 26 was amended in 2010 to include Fed. R. Civ. P. 26(a)(2)(C), which provides that experts not required to provide an expert report must nonetheless disclose (i) the subject matter of the witness's expected testimony under Federal Rule of Evidence 702, 703, or 704 and (ii) a summary of the facts and opinions about which the expert will testify. 3 Robert L. Haig, Business and Commercial Litigation in Federal Courts § 29:10 (4th ed.2018). The advisory committee's notes state that "[a] witness who is not required to provide a report under Rule 26(a)(2)(B) may both testify as a fact witness and also provide expert testimony under Evidence Rule 702, 703, or 705" and note that "[f]requent examples include physicians or other health care professionals." Fed. R. Civ. P. 26 Advisory Comm. Notes (2010). *See also Republic of Ecuador v. Mackay*, 742 F.3d 860, 866 n.1 (9th Cir. 2014) ("These experts typically include treating physicians or a party's employees who do not regularly provide expert testimony."); *Alfaro v. D. Las Vegas, Inc.*, No. 2:15-cv-02190-MMD-PAL, 2016 WL 4473421, at *11 (D. Nev. Aug. 24, 2016) ("A treating physician is still a percipient witness of the treatment rendered and may testify as a fact witness and also provide expert testimony under Federal Evidence Rules 702, 703, and 705. However, with respect to expert opinions offered, a Rule 26(a)(2)(C) disclosure is now required.").

Federal Rule of Evidence ("Rule") 702 governs the admissibility of expert testimony. Under Rule 702, a proposed expert witness must first qualify as an expert by "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. The proposed expert witness may then testify in the form of an opinion if: "(a) the expert's . . . specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." *Id.*

The trial court serves a special "gatekeeping" function with respect to Rule 702. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999). The trial court must make an initial assessment of the proposed expert testimony to ensure that it "rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597. In other words, the trial court must consider (1) whether the reasoning or methodology underlying the expert testimony is valid (the reliability prong); and (2) whether the reasoning or methodology can be applied to the facts in issue (the relevancy prong). *See id.* at 592-93.

To determine the reliability of expert testimony, the Supreme Court has identified four factors that a trial court may consider: "(1) whether the 'scientific knowledge . . . can be (and has been) tested'; (2) whether 'the theory or technique has been subjected to peer review and publication'; (3) 'the known or potential rate of error'; and (4) 'general acceptance.'" *Obrey v. Johnson*, 400 F.3d 691, 696 (9th Cir. 2005) (quoting *Daubert*, 509 U.S. at 593-94). These factors, however, are not exclusive. *See Kumho Tire*, 526 U.S. at 150 ("*Daubert* makes clear that the factors it mentions do *not* constitute a definitive checklist or test." (emphasis in the original) (citation and internal quotation marks omitted)). Rather, the trial court enjoys "broad latitude" in deciding how to determine the reliability of proposed expert testimony. *Id.* at 141-42. As to relevancy, the Supreme Court has explained that expert testimony is relevant if it assists the trier of fact in understanding evidence or determining a fact in issue in the case. *Daubert,* 509 U.S. at 591.

The proponent of the expert testimony carries the burden of proving its admissibility.  Fed. R. Evid. 702 advisory committee's note to 2000 amendment; *Lust v. Merrell Dow Pharms., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996).

### b.  <u>Discussion</u>

Defendant argues that Dr. Margolis's opinions are unreliable and should be excluded.  In particular, Defendant argues that Dr. Margolis's opinions that Dr. Enderton should have identified the bowel perforation prior to the end of the surgery and that Dr. Enderton should not have discharged Plaintiff on December 17, 2014, are unsupported because Dr. Margolis failed to address evidence in the medical record contrary to these opinions and do not cite authoritative medical sources.

Dr. Margolis's expert report states that it was within the standard of care for Plaintiff to undergo surgical treatment for her uterine fibroids but that the performance of the surgery and post-operative treatment fell below the standard of care.  First, "based on the timing and development of symptoms and the nature of the injury incurred by the Plaintiff, the identified bowel perforation occurred during surgery and was not identified by the operative surgeon."  Margolis Report ¶ 2(a).  Dr. Margolis states that the perforation could have resulted from the da Vinci system or from improper use of the system but does not opine as to which was the cause.  Instead, his report states that "[g]enerally accepted standards would have required the operating surgeon to have identified and corrected this issue prior to completion of the surgery.  The size, nature and severity of the injury would have been identifiable to the operative surgeon at the time of the surgery." *Id.*  Defendant argues that Dr. Margolis's report "fails to cite any evidence in the medical record for this conclusion and he fails to provide any details or explanation for his wholly conclusory and ambiguous statement."  Mot. at 11.  Defendant's expert Dr. Mirhashemi's expert report states that bowel perforation could not have occurred during the surgery because "fecal contents would be clearly visualized" at that time, and Plaintiff would have experienced immediate signs

of sepsis. Mirhashemi Report ¶ 3.[5] Defendant also cites Dr. Enderton's testimony that during the surgery she looked for bowel injury but did not observe any at the time. *Id.* n.2 (citing Enderton Depo. at 56:3-60:6). Dr. Enderton's testimony that she observed no bowel perforation during the procedure does not render Dr. Margolis's testimony unreliable; it is instead part of the basis for his conclusion that the treatment rendered was below the standard of care.

Dr. Margolis's report next states that on the morning of December 17, 2014, Plaintiff "was identified as having an elevated white blood cell count, elevated temperature and feverish condition. The generally accepted standard of care for persons within the medical community would have required the operative surgeon not to discharge the patient and to continue to monitor the patient's symptoms." Margolis Report ¶ 2(b). It concludes that if the symptoms worsened, "laparoscopic exploratory surgery would have been required to correct the source of the ongoing symptoms . . . ." *Id.*

Defendant's expert Dr. Mirhashemi disagrees with Dr. Margolis's opinion, stating in his report that Dr. Enderton's decision to admit Plaintiff for two days following what is normally an outpatient procedure was within the standard of care, because at the time of discharge, Plaintiff's "white blood cell count was trending down and she was without a fever." Mirhashemi Report ¶ 4.[6] Dr. Mirhashemi further notes that an elevated white blood cell count after this sort of procedure is "extremely common." *Id.* Defendant faults Dr. Margolis for "fail[ing] to acknowledge that the white blood cell count was

---

[5] Dr. Mirhashemi testified at his deposition that he could not opine on whether the size of the burn was one that would have been immediately visible because he was unaware of what size the burn was. Mirhashemi Depo. at 17:14-18 ("Q. Considering the size of the burn that Ms. Martinez received, would you consider that type of burn to be difficult to detect? A. I'm not aware of what size a burn that she received, so I really can't comment on that.").

[6] Plaintiff objects to the report as inadmissible hearsay because it is an unsworn expert report, citing *Liebling v. Novartis Pharm. Corp.*, No. CV 11-10263 MMM (MRWx), 2014 WL 12576619, at *1 (C.D. Cal. Mar. 24, 2014), for the proposition that "it is well established that unsworn expert reports are inadmissible and cannot be used to create a triable issue of fact for purposes of summary judgment." ECF No. 62. As Defendant correctly points out, courts have also held "that a party can 'cure' the defect of an unsworn expert's report by proffering the sworn deposition or declaration of the expert." *Liebling*, 2014 WL at *2 (collecting cases and granting leave for expert for file a sworn declaration or submit sworn deposition testimony). Defendant here submitted a sworn declaration from Dr. Mirhashemi with the reply brief. ECF No. 66-3. This sworn declaration, attached to his previously submitted expert report (which was the subject of his deposition testimony, which Plaintiff submitted with her opposition), is sufficient to cure the procedural deficiency of the original filing and to permit its consideration with the rest of the summary-judgment record.

trending downward"[7] and notes that Dr. Enderton gave Plaintiff instructions to return if her symptoms worsened or if she had any problems.

"The purpose of [expert] reports is not to replicate every word that the expert might say on the stand." *Walsh v. Chez*, 583 F.3d 990, 994 (7th Cir. 2009). The purpose "is instead to convey the substance of the expert's opinion (along with the other background information required by Rule 26(a)(2)(B)) so that the opponent will be ready to rebut, to cross-examine, and to offer a competing expert if necessary." *Id.*; *cf. McClellan v. I-Flow Corp.*, 710 F. Supp. 2d 1092, 1115 n.14 (D. Or. 2010) (noting that "[t]he purpose of expert reports is to 'avoid unfair surprise by enabling the adversary to prepare a response to the expert testimony,'" not to explicate every word of the methodology, and holding that in light of "the numerous, lengthy, and altogether comprehensive depositions of plaintiffs' experts, any infirmity in an expert's report is not prejudicial and does not warrant exclusion"); *Castillo v. City & Cty. of San Francisco*, No. C 05-00284 WHA, 2006 WL 618589, at *2 (N.D. Cal. Mar. 9, 2006) (noting that if a party had been on notice that a physician would offer opinion testimony, it might have filed a *Daubert* motion, for which "a deposition would have been most helpful"). Defendant could have deposed Dr. Margolis to develop the expert record in support of its effort to preclude Dr. Margolis from testifying. It did not. The Court is left with Dr. Margolis's expert report, based on his experience and review of the medical records, which Defendant challenges by citing to its own expert Dr. Mirhashemi's report, which is based on his experience and review of the medical records. Indeed, as to Defendant's argument that Dr. Margolis's failure to cite authoritative material is fatal to the admissibility of his opinions, the Court notes that Defendant's expert, Dr. Mirhashemi, in this respect does not differ from Dr. Margolis. *See* Mirhashemi Depo. at 20:8-12 ("Most of the things that I wrote here were clinical judgment and my medical experience, surgical experience through practice as well as

---

[7] According to Dr. Enderton's deposition, prior to the surgery, Plaintiff's white blood cell count was 7.63, within the reference range of 4.0 to 11.0. At approximately 5:49 p.m. on December 15, 2014, the count was 16.04. At 4:12 p.m. on December 16, 2014, the count was 14.84. Enderton Depo. at 70:1-22, 71:8-17. Plaintiff was discharged the next day.

journals that I read, but I don't recall those particular articles.").

Finally, Defendant cites case law for the proposition that "[a] difference of medical opinion concerning the desirability of one particular medical procedure over another does not, however, establish that the determination to use one of the procedures was negligent." *Clemens v. Regents of Univ. of California*, 8 Cal. App. 3d 1, 13 (1970). This is not such a scenario. The dispute here centers on the standard of care – whether Plaintiff had a bowel perforation that should have been detected at the time of surgery and whether Plaintiff should have been discharged on December 17, 2014.

Precluding a properly credentialed expert witness from offering trial testimony solely on the basis of that expert's report without the benefit of developing a record through a deposition is a tall task, and one that Defendant has not succeeded in accomplishing here. Defendant has not demonstrated that Dr. Margolis's opinions are unreliable and should be precluded.

Accordingly, Plaintiff has put forward a *prima facie* case that Dr. Enderton breached the standard of care, and the motion for summary judgment is DENIED.

**B.    Summary Adjudication Of Damage Claims**

Defendant argues that even if Plaintiff succeeded in making a *prima facie* case of negligence, it is entitled to summary adjudication on Plaintiff's damages claims for future medical expenses and lost future earnings. There are three "basic steps for calculating pecuniary damages under the FTCA: (1) compute the value of the plaintiff's loss according to state law; (2) deduct federal and state taxes from the portion for lost earnings; and (3) discount the total award to present value." *Shaw v. United States*, 741 F.2d 1202, 1205 (9th Cir. 1984). California law provides that "[d]amages may be awarded, in a judicial proceeding, for detriment resulting after the commencement thereof, or certain to result in the future." Cal. Civ. Code § 3283. Any such "prospective detriment must be so proven that from the proof the trier of fact can reasonably conclude that the claimed detriment is reasonably certain to occur." *Regalado v. Callaghan*, 3 Cal. App. 5th 582, 602 (2016) (alterations omitted) (quoting *Khan v. S. Pac. Co.*, 132 Cal. App. 2d 410, 416 (1955)). "[I]t is fundamental that 'damages which are speculative,

remote, imaginary, contingent, or merely possible cannot serve as a legal basis for recovery.'" *Piscitelli v. Friedenberg*, 87 Cal. App. 4th 953, 989 (2001) (citation omitted); *see also Regalado*, 3 Cal. App. 5th at 602 ("An award of damages must be predicated on something more than mere possibilities.").

### 1. Future Medical Expenses

Defendant first argues that recent medical records show that Plaintiff has "recovered" and that none of her regular medical providers has suggested that she needs future medical care,[8] leaving Plaintiff with only speculation and conjecture to support the claim for future medical expenses. Mot. at 14. "An injured plaintiff is entitled to recover the reasonable value of medical services that are reasonably certain to be necessary in the future." *Corenbaum v. Lampkin*, 215 Cal. App. 4th 1308, 1330 (2013) (citing Cal. Civ. Code §§ 3283 (providing for award of damages "for detriment . . . certain to result in the future"), 3359 (providing that damages "must, in all cases, be reasonable")), *as modified* (May 13, 2013). "It is for the [finder of fact] to determine the probabilities as to whether future detriment is reasonably certain to occur in any particular case." *Garcia v. Duro Dyne Corp*., 156 Cal. App. 4th 92, 97 (2007).

In support of its argument that Plaintiff has recovered, Defendant relies on a medical record from August 15, 2018, during Plaintiff's visit to the UCSF Medical Center. Lodge Decl., Ex. 3. This record states that following Plaintiff's robotic hysterectomy, she had "a likely bowel injury resulting in sepsis, enterocutaneous fistula, and abdominal wall abscess. At that time she was transferred to UCSF and underwent [incision and drainage] of her abdominal wall. Since then she has recovered from this episode but noticed a hernia at the I+D site over the last few years . . . ." *Id*. Plaintiff objects that this hearsay document was obtained after the close of fact discovery and never produced. Opp. at 19. The hearsay objection is overruled. Medical records kept in the ordinary course of business fall under an exception to the rule against hearsay and could be admissible at trial. Fed. R. Evid. 803(6);[9] *United*

---

[8] The lone exception is a hernia repair that the parties agree is not at issue in this case. Reply at 5 n.2.

[9] That section provides that "regardless of whether the declarant is available as a witness," the following is not excluded

*States v. Hall*, 419 F.3d 980, 987 (9th Cir. 2005) ("medical records from Hawkins' hospital visit and the notes of Hall's parole officer were records kept in the ordinary course of business, classic exceptions to the hearsay rule" (citing Fed. R. Evid. 803(6))). The record could be admissible at trial and is properly considered in a motion for summary judgment. *See Fraser v. Goodale*, 342 F.3d 1032, 1037 (9th Cir. 2003) (considering the contents of a diary on a motion for summary judgment, over a hearsay objection, because the contents, "depending on the circumstances, could be admitted into evidence at trial in a variety of ways").[10]

Nevertheless, the document's casual reference to her recovery does not establish that Plaintiff has no reasonable certainty of future medical expenses, especially in light of conflicting evidence from Plaintiff's deposition and from Dr. Margolis's expert report. Nor does the fact that Plaintiff's "regular medical providers" do not suggest the need for future medical care preclude the issue from being presented at trial where there is contrary expert testimony. *See Burnett v. United States*, No. EDCV 15-1707-CAS (KKx), 2016 WL 8732344, at *4 (C.D. Cal. Aug. 17, 2016) ("While the treating physician's testimony is strong evidence Plaintiff will not incur future medical damages for future surgeries, it does

---

under the rule against hearsay:

> (6) Records of a Regularly Conducted Activity. A record of an act, event, condition, opinion, or diagnosis if:
>
> (A) the record was made at or near the time by--or from information transmitted by--someone with knowledge;
>
> (B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;
>
> (C) making the record was a regular practice of that activity;
>
> (D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and
>
> (E) the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.

Fed. R. Evid. 803(6).

[10] The UCSF medical record would be admissible at trial only if it is properly authenticated. *See* Fed. R. Evid. 901(a).

not preclude Plaintiff from offering expert testimony in support of his position."), *report and recommendation adopted*, No. EDCV 15-1707-CAS (KKx), 2016 WL 8738996 (C.D. Cal. Aug. 19, 2016).

Dr. Margolis's expert report states that Plaintiff "will require the following future medical treatments to a reasonable degree of medical certainty: chronic pain control, future bowel/abdominal surgery, laboratory and radiologic evaluations and physical therapy." Margolis Report ¶ 6. Dr. Margolis estimates the reasonable value of these services to be between $250,000 to $1,500,000. *Id*. Defendant argues that Dr. Margolis fails to identify any future medical treatment to a reasonable degree of medical certainty, and that without specific evidence of the need for future medical treatment, the claim is too speculative to proceed to trial.

California courts have not set so high a bar for testimony concerning future medical expenses. In *Regalado v. Callaghan*, for instance, the California Court of Appeal held that there was sufficient evidence to support a jury's award of future medical expenses where it heard expert testimony that it was more likely than not that a plaintiff would require future surgery, even though the defendant argued that the expert's opinion was speculative because the expert had testified that individuals with plaintiff's condition "are '*more likely* to develop arthritic changes that *could* lead one to need additional surgery.'" 3 Cal. App. 5th 582, 602 (2016). The court held that "[t]he fact that there was some uncertainty as to whether [the plaintiff] would develop arthritic changes requiring additional surgery does not preclude a finding that it was reasonably certain he would need future surgery." *Id*. The court cited other cases involving uncertain expert testimony. In one case, the court found "sufficient to support a finding of future damages with reasonable certainty" testimony from an expert that "'it is reasonable to assume he is going to have trouble . . . in the future. Just how much, I don't know. Just what the course of that trouble will be, I don't know." *Id*. (quoting *Ostertag v. Bethlehem Shipbuilding Corp*., 65 Cal. App. 2d 795, 805-06 (1944)) (alteration in original). In another, the court found that "the jury could reasonably conclude that plaintiff was reasonably certain to experience some pain and disability for the rest of his

life" where the plaintiff's expert "based his opinion on future damages on the fact the plaintiff was still experiencing pain two years after the accident and his experience that '[f]requently in this type of neck injury a patient will continue to have symptoms indefinitely' and '[i]t may last forever; . . . it may get worse; he may improve somewhat.'" *Id*. at 603 (quoting *Guerra v. Balestrieri*, 127 Cal. App. 2d 511, 518-19 (1954)). That future damages may be "subject to various possible contingencies does not bar recovery." *Id*. at 602.

Dr. Margolis's testimony may ultimately prove too speculative to carry the burden of establishing by a preponderance of the evidence that the injury is reasonably certain to result in future medical expenses and warrant an award of damages, but the opinion outlined in his expert report is enough to create a factual dispute for trial.[11]

---

[11] The Court also notes that Defendant's expert Dr. Mirhashemi conceded at deposition that he could not rule out that Plaintiff might need further surgery to address her ongoing pain:

Q. What documents are you relying on that support your opinion that Ms. Martinez will not need surgery in the future?

A. I believe the records that I received from UCSF.

Q. Do you recall what specifically was said in those records that informed your opinion on that point?

A. Well, that basically the drains were removed and she didn't not require an ostomy, so I'm presuming -- there's no ostomy, there's no need for reversal and there's no drain, there's no need for any further intervention.

Q. And what is an ostomy?

A. Colostomy or ileostomy is a condition where a bag is required due to externalization of a segment of the bowel or intestine.

Q. Before you had mentioned that Ms. Martinez's complaints of pain may be caused by scar tissue, do you recall that?

A. I do.

Q. Are you familiar or aware of any type of surgery that could be used to help an individual suffering from pain due to scar tissue?

A. Yes.

Q. Were you able to rule that out as a possibility for Ms. Martinez in the future?

## 2. __Future Earnings__

Defendant also argues that Plaintiff has not put forward sufficient evidence of a loss of future earnings for the claim to proceed to trial. A plaintiff seeking damages for loss of earning capacity bears the burden of demonstrating that she is "reasonably certain to suffer a loss of future earnings." *Licudine v. Cedars-Sinai Med. Ctr.*, 3 Cal. App. 5th 881, 892 (2016) (quoting *Robison v. Atchison, T. & S.F. Ry. Co.*, 211 Cal. App. 2d 280, 288 (1962)). A finder of fact may, but is not required to, "infer the reasonable certainty of such a loss from the nature of the injury," though a plaintiff is entitled to no damages for loss of earning capacity "where the evidence demonstrates there was no such loss." *Id.* The value of any loss of earning capacity is "the difference between what the plaintiff's earning capacity was before her injury and what it is after the injury." *Id.* at 893 (citing Restatement 2d Torts, § 924, com. d).

Defendant argues that because Plaintiff works full-time, including hundreds of hours of overtime annually, and that no doctor has identified a disability that would interfere with her ability to do the type of job in which she is currently employed, she cannot demonstrate any lost future earnings. Mot. at 15. Without any evidence of a work disability, Defendant argues, Plaintiff cannot show any reasonable probability of lost earnings in the future. Reply at 6. Plaintiff's opposition does not directly respond to the argument about future earnings, focusing instead on Plaintiff's ongoing medical and psychological problems, which she has continued to experience even while working full-time. Opp. at 19-20. Plaintiff did submit in support of its opposition to the motion, however, a copy of the report of its economic-valuation expert, Enrique Vega. ECF No. 58-1, Ex. C-1. That report calculates that in light of Plaintiff's "nonsevere physical disability" as a result of the injury sustained during the surgery at issue in this case, she has a 6.6-year loss in worklife expectancy, and calculates the economic loss resulting from

---

A. No.

Mirhashemi Depo. at 40:20-41:20.

this decrease in worklife expectancy. *Id*. at PDF p. 138-39. This is enough to create a triable issue of fact for trial.

## V. CONCLUSION AND ORDER

For the reasons set forth above, Defendant's motion for summary judgment is **DENIED**, and Defendant's motion in the alternative for summary adjudication of Plaintiff's claims for future medical expenses and lost future earnings is **DENIED**.

IT IS SO ORDERED.

Dated: __**January 18, 2019**__　　　　　_____**/s/ Lawrence J. O'Neill**_____
　　　　　　　　　　　　　　　　　　UNITED STATES CHIEF DISTRICT JUDGE